By the Court. Slosson, J.
The case, as now presented, does not appear to be materially different from what it was on the former trial.
By section 215, of the Code, it is provided, in an action for the recovery of the possession of personal property, where an immediate delivery is claimed, that the sheriff having taken the property “shall keep it in a secure place and deliver it to the party entitled thereto, on receiving his lawful fees for taking, and his necessary expenses for keeping the same.”
Unless the property is claimed by a third person (section 216), the sheriff is bound to deliver it to the plaintiff after the expiration of three days from the original taking of it, and service of the plaintiff’s affidavit and notice on the defendant, provided the defendant himself has not within that time required a return thereof, and given the requisite undertaking (section 211), and in such event he must deliver it, if the defendant’s sureties fail to justify as provided by section 212.
If the sheriff takes the property into his own custody, he is bound only to, ordinary care and diligence in the custody of it, that is, he is bound to take that care of it which a prudent man would take of his own property, but if he leaves it in the possession of the defendant in the action, he becomes an insurer of it to the plaintiff, and nothing will excuse him for its loss but the act of God, or of the public enemies.
This is the rule applicable to sheriffs, who have taken property under execution, and there is no reason why it should not *363 be equally applicable, where property is taken under claim and delivery in replevin.—Browning v. Hanford, on appeal, 5 Denio Rep. 586.
In the present instance the sheriff did not take actual possession of the property replevied, which was a cargo of coal, in a schooner, lying at the wharf—he contented himself with serving the papers on the captain of the vessel, who was the defendant in the action, and leaving two men in charge of it, with directions to the defendant not to remove it until the following Tuesday, when the plaintiff’s sureties were to justify.
■ It was during this interval that the vessel was^sunk.
On the evidence there cannot be a doubt that the vessel moored where she was, was an “ insecure place” for the keeping of the coal—-a storm ensued within a very brief period, and she sunk at the wharf with all the coal on board—the evidence is equally clear, that the men who were left in charge of the coal, wholly neglected their dufy—one was to watch by day, the other by night—neither on Saturday night, nor on Sunday, nor on Sunday night, during all which time the storm prevailed, do these men appear to have been on board.
On Saturday afternoon, Hallenbeck, one of the two men, was there between five and six o’clock, but he says himself that “ he went home and went to bed of nights”—he was a witness for the defendant.
He says, “I left a police officer of that ward in charge of her to see that the vessel was not removed. I gave him, no other charge—did not tell him to watch the safety of the vessel from the storm. I had no charge to take care of the safety of the vessel. I was charged by the sheriff, to take charge of the coal, and see that the vessel was not removed. I was not charged to see to her safety from sinking. I did not care to see that any one slept on board.”
Quin, one of the hands of the schooner, and who was a witness for the plaintiff, swears, that on Saturday afternoon, the captain of the vessel (defendant in the replevin) was very anxious to have the vessel moved around to the other side of the pier, where she would have been in comparative safety, and that he came there on purpose to do it, and asked the man in charge of the coal, (the sheriff’s man) if he would let him do so, but that *364 he refused to permit him". In this he is contradicted by Hallenbeck, but he is supported by the captain himself, who'was sworn for the plaintiff in this action; and substantially also by Black-man the mate. The captain also swears that when the replevin papers were served, he told the deputy sheriff, that if- he. would not allow the plaintiff to take the coal; he. must take-it out of the vessel, but that the sheriff said, that he would not, but would deliver it to the plaintiff when the sureties had. justified.
In this also, he is contradicted by Hallenbeck,-who says, he was present at the interview, and he is also contradicted by the deputy. p - '
The defendant’s counsel insists that .here was a conflict of testimony sufficient to have carried the -case-to the jury,.on the question; whether the defendant had exercised that care in the keeping of the property which the law," and his official duty imposed on him ?' .....
■We think that, under the rule above laid down, the defendant’s liability does, not depend on the mere question of.his diligence in taking care of the property where it lay, or of the vessel in which it was laden—having seen fit to leave it there in the actual possession of the defendant in the replevin, he assumed all risks; but if it does depend on the question of diligence, we think, on the evidence of Hallenbeck himself, not to speak of- the others, that the proof is overwhelming that the sheriff was guilty of the grossest negligence, and that a verdict the other way could not be sustained.
Hallenbeck says, “ He should have thought the vessel -was safe, but he had nothing to do with her safety.” , That-is the thing with which he had most to do; the safety of the. cargo was wholly dependant on that- of the vessel; even if it were not negligence to have left the coal on board in the first instance, it was clearly the duty of the sheriff, having assumed the custody of the coal in such a position, to see that the vessel itself was kept in. safety. He was not obliged to wait for'the captain’s directions ; he should have, himself, as a prudent man,- applied to the captain to remove the vessel.
It was perfectly obvious from, the testimony, that on the side of the slip where she lay, she was exposed-to the full force of the storm, from which she would have been partially, if not *365 wholly screened, by hauling around to the other side of the slip, and that her situation where she lay, heavily laden almost to the water’s edge, was one of imminent peril—the evidence is, that she was laden .to within four to six inches of the water’s edge.
Quinn, one of the hands belonging to the schooner, swears there was plenty of room on the other side of the pier for her ; that another coal vessel was lying on the other side, loaded nearly the same as she was, and which suffered no damage, and he does not believe she would have sunk there.
It seems almost incredible, that with such obvious means of safety before them, these men, whose special duty it was to protect the coal, should have so recklessly left the vessel and her cargo to withstand the winds and waves which, in her laden condition and exposed position, threatened her every moment with destruction. They seem to have considered, that so long as they prevented the removal of the vessel from the berth which she occupied at the slip, their whole duty in respect to the custody of the coal, was discharged; and even this duty was, if performed at all during the night, performed by some policeman of the district, who was in no way responsible for the safety of' the, coal.
We cannot doubt that the Chief-Justice was justified in removing all questions from the jury, except those of damages.
The vessel was actually raised by the owners, on an agreement with the plaintiff to divide the expense in proportion to the values of the cargo and vessel: the expense was $529, and the plaintiff’s share of it was $264 50.
The sheriff was not bound by this agreement, to which he was not a party, and the Judge left it to the jury to say what was a fair and reasonable amount to allow the plaintiff for the expense of getting up the coal. He also left it to them to determine the amount which should be allowed for the deterioration of the coal by its submersion. In both particulars he was right.
We question whether the sheriff is at liberty to put in issue the title of the plaintiff to the goods. As against the sheriff, he is, primd facie, the owner. When the sheriff takes the property under this process, he takes it as the plaintiff’s property, and the law will not tolerate that he shall reheve himself from responsibility for his own negligence, by denying the plaintiff’s title to the *366 property; "but if-it were otherwise, the bill of lading was good evidence, as against him, of that title—at least prima fade. It established in the plaintiff a right to the possession of 'the goods.
It was also good prima fade evidence of the quantity of coal on board.
The defendant presented eleven distinct propositions to the Judge, to be submitted as law to the jury, each of which he refused to charge, and for which refusal in each particular, his counsel excepted.
Under the views we have taken of his responsibility, by reason of leaving the property in the defendant’s hands, we think all these exceptions were properly overruled. A doubt, perhaps, may arise as to the third and seventh request.
The third was in substance a request to charge that if'the jury believed that the plaintiff assented to the property remaining in the vessel, the defendant was not liable, and that such assent might be inferred from the plaintiff’s acts, in connection with the facts proved in the case.
In respect to this, it is perhaps enough to say that the whole responsibility of putting the property in a place of security rested on the defendant, and nothing short of the most positive evidence of an assent of the plaintiff to his selecting any particular place of deposit should be allowed in exculpation of-a breach of his duty in this respect. There was no such evidence in the case, and none which would warrant the jury in finding an assent at all. The Judge therefore properly refused to submit that question to the jury.
The seventh request involved thé proposition that the settlement of the replevin suit, and the delivery of the coal by the sheriff to the plaintiff in that suit (plaintiff also in this), and the acceptance thereof by the latter, was an extinguishment of his claim to damages.
The evidence is, that after the coal was got up, the deputy sheriff went to the plaintiff for the purpose of delivering it to him—that he asked him if he was ready to receive it? he said, yes. The sheriff told him to go and take it, and the plaintiff said he would send his carts and get it; which he did.
This is not such a delivery as the law contemplates. It was not the coal in the condition in- which the sheriff had taken it *367 under Ms authority, and the receiving it by the plaintiff was no waiver of Ms claim for damages agamst the sheriff, if the sheriff was liable for damages. It would have been idle for the plaintiff to have refused to receive the coal.
The case has not the remotest analogy to that of waiver of a condition precedent, or of a forfeiture, or to a release, estoppel, or any other act by which a right accrued is lost by the agreement, default, or laches of the party.
Judgment should be for the plaintiff.
Judgment was ordered accordingly.